of persons and so on and so forth. In retrospect, it's not as clear that granting all that additional time was warranted. So the point is to say all three of us are immersed in the factual background of this case and what transpired and the other lawsuits that have been up here before the panels and so on and so forth. So for us, you can, you know, cut to the chase and rivet in on the key issues rather than spending a whole lot of extra time going all the way back, you know, to the beginning. And if you don't need the time, giving it back is fine. All right, Ms. Hutchinson. May I please have the floor? If I am to understand, Your Honor, you want me to address both appeals simultaneously? No, no, no. I'm not saying that. All I'm saying is when we granted the extra time was based on the consolidation of these cases, which a lot of times there are distinct parts to it and 50 lawyers and the whole shmeal. In retrospect, that's, they are still technically consolidated, but it's not necessarily. We kind of got the same officers and a few number of lawyers, so might not have gotten it if we looked at the time. So it's just to say, because you have 30 minutes, doesn't mean that you got to take the time to take us back to square one, because we've read and are familiar with the backdrop, the other cases that came up to another panel on a motion to dismiss and so forth. And I don't really anticipate taking that much time, Your Honor, and I know we've been up here a couple of times. Right. That's my main admonition is for you to know that we know it's been here before. We've read those, so it's been time on, you know, the most germane portions. Go ahead. You're good. Go ahead. In this case, I believe that Detective Meeks and Officer Scott are taking a different approach than Ranger Barnes with respect to the qualified immunity issue. My reading of it is that Detective Meeks and Officer Scott are taking the position that probable cause existed for an arrest and that would justify the detention versus Ranger Barnes who's taking the position that consent for the interrogation existed. So addressing first the issue of probable cause, it's certainly our belief, first of all, that the evidence is pretty clear, the summary judgment evidence is pretty clear that neither Detective Meeks nor Officer Scott believed that they were making any kind of an arrest or that they were going to bring any kind of charges, had any intention of bringing any kind of charges, that they acknowledged repeatedly that it was simply an interrogation. This Court has held that there's got to be probable cause for that kind of an interrogation, that kind of a custodial interrogation. And so the issue is whether there indeed existed any kind of probable cause. And the cases cited by those appellees bring up the issue of whether or not Detective Meeks and Officer Scott could rely upon some sort of nebulous potential probable cause that may have existed before they arrived on the scene or before they took her into custody. She was the sole witness to the shooting, so that's not exactly nebulous. That's a fact. But that's not probable cause for a custodial interrogation or for an arrest. Well, they didn't arrest her. They put her in a police car. But this Court has held that that was tantamount to an arrest and I'm citing Dunaway versus New York and Davis versus Mississippi. This Court in these circumstances, in this case, stated that detention for custodial interrogation intrudes so severely on interest protected by the Fourth Amendment as necessary to trigger the traditional safeguards against an illegal arrest. So basically comparing the custodial interrogation to an arrest and requiring probable cause for that. This Court also found in this case that there was no question about the shooting itself because there were obviously dozens of police officers that also witnessed the shooting that were in fact the shooters and that it occurred while both Erin and her father were standing in the doorway of the home and therefore there was really no question about how it occurred and there were, you know, for any sort of expedited process since there really wasn't any question about what had happened and there was no necessity to interrogate her immediately. Additionally, the summary judgment shows that she had been in the, she'd been taken into custody, placed in handcuffs, put in the back of the police car and stood guard over for several hours before Officer Scott and Detective Officer Scott took her to the police station and Detective Meeks and Ranger Barnes questioned her. So there wasn't anything about the situation that required any kind of an urgency. So this Court found that under these circumstances the law was clearly established under Davis and Dunway that there had to be probable cause for that kind of custodial interrogation and I think it's clear that there was no justification for that. The issue of whether or not there was a probable cause for any sort of other underlying charge such as I think there is an allegation that there could be a potential charge for police officer because she allegedly was kicking and screaming when the SWAT officer was removing her from the scene, but the summary judgment evidence establishes through her own testimony and affidavit that she was in fact not, that she wasn't fighting, resisting, kicking or screaming and that she, while when she was in the back of the police car she was sobbing and shaking as you can as you can see on the video, she wasn't resisting in any way or fighting in any way. Okay, so what weight should we give to the district judge's conception of this case and the analysis the Judge McBride gave? He didn't deal with any of this and he looked at saying that the officers believed that she was agreeing to stay and be questioned. What about that? Your Honor, I don't see how that, interestingly enough, the recent U.S. Supreme Court Westby case actually I think provides support for the appellant in this case because it says you've got to look at the common sense factors of the situation. You've got a young lady who was obviously distraught, sobbing uncontrollably, placed in handcuffs in the back of a police car with officers standing guard over her and she asked when she would be able to go home. You've got her family members. Somebody who's not one of the defendants, correct, when she'd be allowed to go home. Yes. Is that shared with the defendants that you know of? There's no evidence of that. Is there any evidence of when the handcuffs came off? There's the video evidence that was presented that the handcuffs came off I believe about 30 minutes after she was in the back of the car. However, she was still in the back of the car with police officers standing guard immediately standing next to her, standing guard over her. It was the middle of the night, freezing cold. She had no coat and no shoes and was in her pajamas. She was surrounded by police cars and police officers and no reasonable person, I can't even think of a single reasonable person that would think that they at that moment could voluntarily leave the scene or go and do whatever they wanted to do. The fact that she didn't resist the officers or say you know I demand my rights or bring me a lawyer or I want to leave or anything like that, I don't think that you can bootstrap that into saying that it was obvious that she was consenting. I think the circumstances made it extremely obvious that she was not consenting and I don't think just using common sense that any reasonable officer would think that a young lady under those circumstances in the middle of the night who'd just seen her father killed in front of her would think that she was voluntarily cooperating with the police officers and giving a statement. There isn't any evidence that anybody asked her if she wanted to cooperate or if she wanted to come to the police station. I asked the officers repeatedly in the depositions, Detective Meeks, did you ever ask her questions or did you give her orders and he said we gave her orders. We told her what she was going to do and what was going to happen to her. They patted her down once in the police car. They patted her down when she arrived at the police station. They would not allow her to see her family and Detective Meeks stated that had she asked, he would not have allowed her to see her family. The family was asking to see her and they would not allow the family to see her or come in contact with her. So there weren't any circumstances in this entire scenario that would have put any reasonable person on notice that they were not in custody with the police or that they had any opportunity to voluntarily leave the scene or not cooperate. With respect to the issue of the case of whether or not other probable cause could be relied upon as in the Devon Peck case, I wanted to address that just briefly saying that I think that the police position that probable cause that the officer was not aware of could provide a legitimate basis to take someone into custody would morph the Devon Peck case into something that I don't think that the Supreme Court intended by saying that if by some happenstance that nobody's aware of, there might be something that you could find out later that would provide probable cause that the officer gets a free pass to take anyone into custody for good reason, bad reason, or no reason. I don't think that that was the intent of that case and the second part of that is that even if that was the intent, there was no underlying probable cause for taking her into custody for anything. In the Turner case, which is a companion case of these where this court addressed whether the SWAT officer could have taken her into custody and placed her in the back of the car, it was not a probable cause issue. It was a securing the scene issue. The court said it was reasonable for that SWAT officer to secure the scene. He could remove her from the scene and place her in the back of the car, but it didn't go so far. There was nothing to go so far as to say there was any kind of probable cause to believe that she committed any crime. She had no right to go back into the house. The house is a crime scene. Right, and she wasn't making any attempt to go back into the house. What are they going to do, let her stand barefooted in the cold? Well, her relatives were at the scene. As a matter of fact, her aunt is a police officer who was at the scene saying, you've got to let us get to her. She has anxiety issues anyway. She just saw her father shot. She doesn't have any shoes or coat. Let us get to her and provide her these comforts. Her aunt lived very close by. They could have taken her there to get her a coat and shoes and comfort and whatever, and they were not allowed to do that. She wasn't allowed to contact them, talk to them, or leave the scene in any way, except to go to the police station. Did you give a statement? Yes, and they took her in, patted her down, put her in a room, and questioned her and had her hand write out a statement. How was this argued in district court by Scott and Meeks? I'm sorry? How was this argued in district court by Scott and Meeks? Did they make the same argument there that they're making here? It, there was, the argument has changed a little bit in that I'm not aware of an argument about sort of a probable cause prior on some other thing providing probable cause for a detention. But, you know, it was argued that there was probable cause to take her into custody. So, if she was handcuffed immediately, I mean, the shooting occurs, police convert. I mean, the door was open, shooting occurs, police converge. So, I took it undisputed fact she was handcuffed at, in that moment. Is that correct? And then taken to the police car. Is that right? Yes, she was. The SWAT officer physically picked her up, threw her over her shoulder, took her out, placed her in handcuffs, I believe, once he got her outside and put her in the back of the police car. Okay, well, that was the question I was asked. She was handcuffed after she was taken off. I thought I had read in one of those cases, which at least appeared to me, that she was, you know, shooting occurs right at the door, father's body, she's handcuffed, then put over the shoulders, taken out. I think, you know, when I take that back, I think you're right. I think he did handcuff her at the scene. Her summary judgment evidence is that when they shot her father, she was standing next to him, he fell, she scooched away and was laying there crying, and the officer handcuffed her, picked her up, and carried physically, carried her out of the scene. I thought you previously said this morning that she was kicking and screaming. No, that was their allegation. She, her position, she was not kicking and screaming. She said, her summary judgment testimony is that she was not kicking and screaming, that she fell to the ground, that she was crying, that she had kind of scooched away a little bit, and that's when Officer Turner handcuffed her and carried her out. Officer Turner's position was that while he was kicking and screaming, she was only sobbing and crying. So, it's our, of course, contention, the summary judgment evidence establishes that she was not doing anything to resist in any way. She, of course, says that she was not. You want to turn to Ranger Barnes or keep dealing with these? Well, I feel like I've addressed Barnes just to the extent that Detective, I mean, Ranger Barnes' position is that there was consent. So, his is a little bit different than Scott and Meek's. They're relying upon probable cause, is my understanding, where Barnes is relying upon consent. And that's when I believe that, you know, any kind of common sense approach would tell you that under these conditions, when you're patting people down and having them in handcuffs and guarding them in the back of a police car, that that is not a condition of consent. And, you know, we don't, I don't think we expect people to resist the police to the extent that they're going to not follow orders that, I mean, I think that any reasonable person, if they're being given an order by a police officer, is going to follow the order by the police officer. I mean, I, you know. You should have been here yesterday. That was a case that disproves your theory. Disproves, well, someone didn't follow an order of a police officer, but they probably ended up getting tased or arrested or, you know, something. Or worse. And so, and I mean, that's, you know, certainly with social media and everything else these days, people know what happens when you don't follow the order of a police officer, and it's not good. And you've got a young, you know, 19-year-old girl in a horrible situation, and she's going to do what she's told to do. She's going to follow the orders of a police officer like any reasonable person would, without having any knowledge that she didn't have the option of doing so. All right. Thank you. Thank you. All right. Mr. Jeffrey, welcome back. May it please the Court. I'm Jim Jeffrey, and I have the honor of representing the officers Meeks and Scott, who worked for the City of Collierville at the time. And I will try to give you back some of the time that you graciously granted me. I'd like to start with the Wesby case, the Supreme Court case Wesby, and the different panel's decision in the Turner case. In the Turner case, the Officer Turner, who was here on a 12B6 motion, not an evidentiary motion for summary judgment, but Turner was here on a 12B6, and a different panel found that he was entitled to qualified immunity for the detention claim. And the detention claim involving Turner basically covers the first roughly two hours of the time that this young lady was in the back seat of the police car. But the summary, and basically the other panel in Turner said that there was no clearly established law holding that Officer Turner couldn't detain her. If she was detained, there was no clearly established law saying that he couldn't detain her as a witness for about two hours. The summary judgment record shows that my two clients did not arrive on the scene and deal with this young lady until more or less they took over from Turner. And then there was a brief amount of time at the scene with Officer Meeks, and that then Officer Scott came up, and Officer Scott was going to be the one that took over the transport, the several minute transport to the station. So Turner is the one who initially... Picked her up, put her over the shoulder. He was one of the SWAT officers, is my understanding. And you heard my question, Counsel, it's undisputed that, you know, shooting occurs, she's there, Turner's the SWAT officer, so he's the first officer to come in contact with Erin Lincoln, is that right? Yes, Your Honor. More or less. So he's the one that the factual site put on the show. So my question, something I read, it seemed to indicate that he handcuffed her immediately and put her over the shoulder, and then of course she remains handcuffed for the rest of the time. Or is it the case that he just, because of she's allegedly kicking, screaming, whatever, removes her and the handcuffing and all that doesn't occur to Is that an undisputed fact now, or which scenario? I'm not saying it's dispositive, but just with this having come up here a couple of times, and they say in 1286, that construted pleadings in light most favorable to the way they will play it versus same scenario coming up for summary judgment, where there is, quote, a summary judgment record as such. Yes, Your Honor. You see what I'm saying? It's a little bit, but anyway, go ahead. Well, let me try to clarify, because there were a lot of officers, and my clients, it is undisputed, had no dealings with Ms. Lincoln for roughly two hours after the shooting. Detective Meeks was off duty at home, but on call, in case the city needed a detective, he had to be summoned to the scene, and when he first got to the scene, Erin Lincoln was in the back seat. He never saw her handcuffed, nor did Officer Scott see the young lady handcuffed. The handcuffs had been removed by the time they had any interaction with her. What I think is notable is what Meeks learned at the scene before he had any contact with Erin Lincoln. The assertion was made that our position has somewhat slightly changed here at the appeal as opposed to what we argue with the lower court. I don't think that's entirely, that's not correct at all. In the lower court, our motion for summary judgment established probable cause grounds and qualified immunity to believe that probable cause grounds existed, and I'll address that in a second, but we also showed in our summary judgment evidence that both Officer Meeks and Officer Scott thought that they were dealing with a willing and cooperative witness, and I think what is very important is the plaintiff put into the summary judgment record a video that's an hour and 41 minutes long. Unfortunately, because of equipment problems, there was no audio recording. It's just backseat recording of Erin in the car, and during that time, she does start off and she's sobbing and she's crying as one would expect at that time. The handcuffs come off roughly 30 minutes in, as Ms. Hutchison notes, but from that point, she calms down. By the time my officers get to the scene, of course they know that she's seen her father shot, but she is calm, she's polite, she's cooperative in every respect. We put that into the summary judgment record with the affidavits of the officers or the declarations of the officers. That's not new. That was part of our motion for summary judgment, but on the probable cause issue, and this is, again, going back to the Wesby case, the most recent iteration, and of course, the intent of the officers was. The Supreme Court has said that both in Devon Peck and most recently in Wesby. It's not their state of mind. It's not their intent. What matters is what they knew, and when Meeks arrived at the scene before he had any contact with Ms. Scott, I mean Ms. Lincoln, he did the natural thing what an officer does, who's called in off duty. Why am I here? What am I supposed to do? They told him, collectively, officers told him what Ms. Lincoln had done. Now, it doesn't matter, it's not material, if Ms. Lincoln states I'm innocent of kicking and screaming and having to be dragged away from the side of my father before the officers could secure his weapon and secure the scene and they get the paramedics to him. She denies that, but the are entitled to rely on what other police officers told them, and Detective Meeks was told upon arrival when her father was shot, she ran to the scene, she had to be picked up and moved because the gun that he was holding, the father was holding, was right there. We have to secure the scene, so the officer Turner picked her up and carried her away, and while he carried her away, my client was told she was kicking and screaming and flailing and striking the officer as he's got her over the shoulder, and that she was then at some point handcuffed and put into the back seat of the car. So my officer knows that before he has any contact with her. He knows that before he gets to her, he's been told by other police officers that she had to be removed so that the other officers could secure the scene, secure the weapon, and let the paramedics come and do their work. Texas Penal Code Section 38.15 makes it a criminal act to interfere with an official's performance of public duties, and the types of public duty officials that can be interfered with are police officers and emergency medical personnel, of course firefighters, but we were employees of the city. Were your clients advised that Aaron was the one who made the 911 call and spoke with the dispatcher? Meeks found that out later, I believe, but did not know upon first arrival, but he understood she was in the house, and again, part of the reason of wanting to question her is to find out what happened, and Officer Meeks stated in his declaration, you know, I'm aware of these accusations or these facts that she kicked and screamed and was, you know, had to be pulled away. I was aware of that, but he says my focus was not on arresting her, and so the state of mind under Devenpeck and under, most recently, Wesby, his state of mind about whether he's going to arrest or not doesn't matter. What matters is he knew the facts that would be probable cause grounds if he had chosen to arrest her, and he says it wasn't my focus to arrest her. I wanted to interview her. I wanted to find out what information she had. I just tell you, I mean, you stated, you know, sort of very articulately, but somehow all it sounds like a stretch given the scenario. I mean, it seems sort of unnecessary, but maybe that's the case, and I guess that's how I got confused with it. You know, this fast action, she makes the call, they come, boom to boom to boom, then all of a sudden somebody's pulling a penal code out to say that the daughter of the person who just got shot away somehow is in the throes of being a potential defendant in the criminal act, immersed in this, to sort of post hoc justify whatever it is the police did. I mean, it looks like if they've got exigencies upon which to do what they did, coming up with saying, well, it's a penal code that might be violated here by not giving a statement seems a little much, and it doesn't come through in, you know, what Judge McBride, you know, made me wonder whether, as she argued coming up, whether that was something that was added later. You know, I don't mean made up, don't get me wrong, but just sort of overlaying all this, that gets a little clumsy in terms of getting to the core matter we have to decide whether the title qualified immunity or not. It gets us all bogged down in this sequence of facts, and who picked her up, and who told what, and so on and so forth, when at the end of the day, as you're citing, that's not really what we're going to be resolving. I would agree that those aren't the key issues that are determinative. I don't know what goes through Judge McBride's mind. I know that his orders are usually clear, direct, and to the point, and... That's definitely, that's definitely... It is common that I make arguments that Judge McBride doesn't let me know if he's agreed with or not. He just doesn't deem them relevant to his ruling, but Officer Meeks testified in his declaration, and again in his deposition, that he wouldn't have arrested this young lady unless he was told to by a supervisor, because he was aware of the shooting. His focus was to get a statement from her. And so is it your position that at the time Meeks comes, based on all the information that was given, it was his thought that arguably there was some basis to arrest, or was the focus still just, you know, questioning her? The absolute focus was his questioning. He didn't plan to arrest her. I candidly state that. He didn't plan to. But under Devenpeck and under Wesby, that doesn't matter. And this is what we argued, and I'm still arguing it. It is an after-the-fact accusation against my clients. Almost two years, barely before the statute of limitations runs out, they find out they're being accused of arresting this young lady or unlawfully detaining her. And in their mind, all they did was try to interview a cooperative witness. Counsel, it seems to me that our Turner opinion from last October basically says this was an effective arrest on the Dunaway and no clearly established right, clearly established law that would that would clarify how this should have been handled. I think there may be law on the circuit now, and I don't quite know how to read the specificity of that opinion, that this sort of extended custodial interrogation could be considered an arrest. You're not arguing the Turner Fifth Circuit opinion very much here. That opinion says up to two hours, or however long that she was initially detained in the car, it's covered by qualified immunity. You're not taking that, that there's not equally on certain law as to whether the next segment of time would not also be unclear as to what needed to be done and what law enforcement's rights may be. What about the Turner case? Is that helpful or not to your two clients? I think it's helpful, and before I digress with answering questions, I wanted to open with talking about how Turner helps. So we got in the way of your answering my question before I even asked it, huh? Well, Turner helps the defendants here because there's no clearly established law that when officers come to the scene two hours or more after the events started, and they take the scene as they get it. And in the White v. Pauley Supreme Court case, the Supreme Court says officers don't have to second guess the conduct of the officers before they arrive. So my clients arrive at the scene, and they more or less think that they're taking this young lady for questioning. Of course, Meeks knows about the potential grounds for probable cause, but there's no clearly established law that says when officers who are both aware of a situation that would support probable cause and think that they're dealing with a willing cooperative witness who was hopefully giving information to help understand what her father was doing when the shooting happened is in violation of clearly established law. And under Wesby, the Supreme Court once again says you have to look at the particular facts, and they very emphatically say in Wesby clearly, and in my opinion for the first time, that the law has to prohibit what the officers did. And so you have Turner where the court says an officer has qualified immunity for the first roughly two hours of the event. And I would contend under the Turner analysis, my client should have qualified immunity for the second phase of this alleged custody because they take it as they get it. They're aware of facts that would support probable cause, but they really think they're dealing with a cooperative witness. No relative, the grandmother and the aunts, were both present. One of the aunts, the police officer aunt and the grandmother both gave interviews, and those are in the recordings of that or in the summary judgment record. They're cooperative. They never say you should have let my granddaughter go. You should let my granddaughter go. And so my clients are basically thinking I've got somebody who is a willing witness, and there's no clearly established law that says I can't keep her here long enough to get her statement. And so Turner is of course very helpful. And when you look at the Wesby case where there has to be a court decision that squarely prohibits the conduct, and there is none, then using the Turner and Wesby analysis, that's dispositive of the case. Thank you. And I've probably used all the extra time I was given. Sorry. Thank you, Mr. Jeffery. Mr. Davis. Thank you, Your Honor, and may it please the Court. Bill Davis for Ranger Barnes. I'd like to focus my could on explaining why the District Court correctly granted summary judgment to Barnes based on his reasonable view of Ms. Lincoln as a consenting witness. And to your point or to your question, Chief Judge Stewart, I think consent is really the easiest way to dispose of all of these cases. And also to your point at the outset, I understand the panel is aware of the facts as they existed in previous cases. Of course here we're on summary judgment. We have a summary judgment record. And if I could point just to a few pieces of evidence from that record that I think are most important. The first is the video of Ms. Lincoln at the police station. I don't think that anyone could view that video and think that Ranger Barnes is acting with violating the law. There's no indication from Ms. Lincoln in that video that she doesn't want to be there, that she wants to end the interview. She's nodding when they asked her to do things. She's answering their questions politely. Beyond the video, there's also evidence in the record that goes to consent attached to Barnes' motion for summary judgment. There was a couple pages from Ms. Lincoln's deposition. This is at page 945 of the record in the Barnes case, which is slightly different pagination-wise from the other record. But at page 945 of the Barnes record, Ms. Lincoln explains that she never told Scott or Meeks or Barnes that she didn't want to go to the station, that she didn't want to be interviewed, that she didn't want to write out a statement. And at the top of that page, she talks about a previous incident two years before in which she had contact with the police, and she says she knew at that time that she didn't have to talk to the police. And she contrasts that with this situation in which she did talk to the police. Another portion of the summary judgment record is from Ms. Lincoln's exhibit. That's an excerpt from the Meeks' deposition in the Barnes record. This is at page 1011 to 1012. He's talking about being at the scene of the shooting, going up to Ms. Lincoln as she's in the patrol car, and saying, we've got another officer coming. We're going to go to the police station and ask you some questions. And her response is, okay. On this record, a reasonable officer would understand Ms. Lincoln to be a consenting witness, but we don't even have to show that. All we have to show is that Ms. Lincoln failed to show that every reasonable officer in this circumstance would understand that he couldn't have an interview with Ms. Lincoln at the station because clearly established law said, in this circumstance, even when you have a person who looks to be consenting, you can't make that statement, you can't support that. The law on consent generally comes up in consent to searches. There's a fairly good body of law on that. There's less law in the consent to interview circumstance, but even so, the test is a totality of the circumstances test. The witness doesn't have to know that she has the right to refuse to consent, but here there's evidence that she did know that. And the officer takes the scene as he finds it, as the district court noted. That's especially true, as Mr. Jeffrey explained, under the White v. Pauley case. Here it's undisputed that Ranger Barnes arrived late to the scene, two hours or so after the shots were fired, at a time at which Ms. Lincoln, the police car, had been in contact with several other officers, and he could assume, if it were reasonable, based on the circumstances, that Ms. Lincoln was a cooperative consenting witness. Now Ms. Hutchison says, well, it couldn't be reasonable to anybody under this circumstance that someone would consent, but that just doesn't square up with the summary judgment evidence, and in particular, the video evidence. And I think in light of that evidence and the Supreme Court's recent and repeated statements about the type of particularity that's needed from clearly established law, this is really an easy case based on consent. The Davis and Dunaway cases apply in a very different circumstance. Those are the cases that Ms. Lincoln cited in support of clearly established law, but there those dealt with suspects who were brought into the station for multiple days, read Miranda rights, and I don't think any reasonable officer, or if some officers thought of Davis and Dunaway in the circumstances, it can't be said that every reasonable officer would think that those cases have any application here. And of course, they also recognize that constitutionally predicated on consent. Counsel, what do we know about the decision to take her from the scene, sitting in the car all those hours, to the station, and the evidence of her consent, or the evidence of how that came about? I don't think we have a lot of evidence on that point, but I would point the Court back to pages... Is there any defendant in this case who would be stationed? I don't know who gave that order. I know that Officer Scott carried it out, in that she was told to drive her to the station. I think part of it was that Ms. Lincoln was barefoot in 28 degree weather, and couldn't go back into the house, could sit in the patrol car, but also taking her to the station was a way to get her indoors and let her tell her side of the question. Because one continuing effect of the Barnes decision by another panel of this Court, in a different legal context, is it did hold that police violate the Fourth Amendment, absent probable cause or consent, when they transport a person to the police station and subject her to prolonged interrogation. So that's law that was said to be applicable here. So I'm just wondering what there is here on consent, beyond the consent you're talking about for everything else, that there was no objection. She seemed willing, and there's at least some plausible understanding, with all due respect to Ms. Hutchison, that somebody saw her father killed would want, to some extent perhaps, to give her side of the story, and maybe even defend her father to some extent. I'm not saying that's particularly relevant here, but I don't find it implausible. So I'm just concerned, but I don't know what defendant has been identified here who would have been responsible for that decision, and where consent even needs to be shown. Well, Judge Southwick, I think an important point is the facts that we, as we have them here, are not the facts that we had in Barnes 1. I try to make that allowance. I understand that Barnes went up on the pleadings, but I just, but it still is a legal statement. Well, right, but on the specific allegation in the complaint that she was unwillingly taken to the police station and questioned, and that's the significant... You said absent consent, and that's what I'm saying. Is there any evidence here about the nature of that decision, what she was doing at the time, what was said to her? I haven't heard anybody talk about it, and I take it that that's not really part of what either side is dealing with in this as to whether the decision to take her to the police station in any way is supported by her consent or is prohibited because of clear evidence of the absence of her consent. So I think the problem for Ms. Lincoln is that she has the burden on this. She has to show that no one could reasonably think she was consenting in the circumstance Barnes encountered. Again, he came late. He didn't see her in handcuffs. He heard from other officers what had happened. He knew that a police officer, Officer Scott, was taking her to the station and that he had been told by another Texas Ranger to question her there. And when he encountered her, she appeared to be a consenting witness. And so I don't know if I've answered Your Honor's question. You've answered it by saying you're the wrong person to ask because your client wasn't involved in the decision. That's correct, Your Honor. All right. If there are no further questions, those are the points I intended to cover. All right. Thank you, sir. All right. Back to you, Ms. Hutchison. Do you have a vote? When Ranger Barnes arrived on the scene, he was the person in charge of the operation. And I believe Detective Meeks has said that in his deposition and that's in the summary judgment evidence. Have you tried to make the point that I have? I mean, is anything in the record to show any better about the taking her to the station than any of these other activities that she was not consenting to it? Is there any evidence that she was not consenting or objecting to being taken to the station? Well, our contention is that all of the evidence points to the fact that she's not consenting, including the fact that her aunts were literally sitting in Officer Scott's car saying over and over again, you've got to get us, you've got to give her to us, she's having problems, that there's no reason to keep us from seeing her, we're worried about her, she's probably freaking out, we need to get her to the hospital, she's not a normal kid, that she's got an anxiety disorder, that we need to get her, get things to her. That's all in the record that the aunts were saying to Officer Scott, sitting in her car, it was so cold they were actually sitting in Officer Scott's vehicle and it's all recorded on Officer Scott's dash cam, which I don't really understand because that's all recorded on her dash cam, but when she transported Erin Lincoln in her car to the station, there's no more dash cam. But in any event, I did want to point out something else about Detective Meeks claiming that he had all of this information about Ms. Lincoln when he that other officers had told her what he did. I'd like to point the court to page nine of our brief referring to the record on appeal, pages 807 to 808, where Detective Meeks testifies that he was told nothing about her conduct when he arrived on the scene, that he was never told that she was suspected of any criminal activity, that he did not even inquire as to why she was confined in the back of the police car. So he makes all those statements at pages 807 to 808 that he was told nothing about her conduct, which I think belies his claim now that he was told all of this information about what she had done and he could use that for probable cause. There was also a statement that nobody was asked, nobody was asking the officers to let her go and I think that is belied by the testimony of the family members, all of whom, including the police officer aunt, say that they did in fact ask to at least take her into their custody. The aunt repeatedly told the officers you don't have the authority to do this, you don't have the authority to keep her against her will, you've got to let me see her and was told no every single time, including by Detective Meeks at the police station. I think you mentioned it in your opening about you want to express about Westby, which the ink is still dry. Westby is a quite an interesting opinion. I think that it actually supports our case because it says that, you know, that use common sense and look at the circumstances that are encountered and no, you don't necessarily look at the, you know, into the mind of the officers to look at their intent, but if you at the plain circumstances that are encountered by these officers, there's, I can't think of a reasonable officer that would believe that you can give a 19-year-old girl orders, not ask her any questions, but don't ask her do you want to go to the police station, will you give us a statement, but give her orders, get in the car, you're going to the police station and not believe that she's going to comply with that. Was the aunt the brother of the father, I mean the sister of the father? The aunt who was at the scene? It was, but there were two aunts. One of them was a police officer with the city of Keller and one of them was the one that was sitting inside the car. Who was she related to, the father? Oh, both of them to the father. To the father? Yes, both to the father. It seems like if they're related to the father, I wouldn't release the sole witness to the father shooting to someone related to the father. Doesn't that make sense? Well, wouldn't that negate their request? Oh, let us take her. Except for the fact that since she was not suspected of any criminal activity, they didn't have that option. It wasn't their call. They didn't get to choose to release her or not release her. She was, I think it's stipulated that she was or not. She knew she was free to go and whether or not the officers would have let her go if she had, you know, whether it was willing or not willing. But whether or not they should have released her to the aunts, I think is not in question because she wasn't suspected of a crime and so she was allegedly not in custody. She was just a witness. And with respect to the difference between Turner and Barnes, we have two opinions out of this court in this case. One of them for Officer Turner's conduct, one of them for Rager Barnes's conduct. Now, I understand that the... You've got a red line. I'm sorry, I do. I apologize. Let me give you a wrap-up statement, not with a lot of commas and colons, but just end your thought. Just in summing up, Your Honor, I would just like to say that I think the difference between the Turner opinion and the Barnes opinion is the point at which the encounter took place. That Turner was securing a scene and that after that she was merely a witness and there was no necessity to secure a scene and so there weren't any circumstances that would justify a detention. Thank you. All right. Counsel, for both sides, brief in the argument. It'll be submitted. Before we take up the third case, we'll stand in recess for...